All rise for the plenary session. 3-15-0-5-5-0. People of the State of Illinois. Appellee by Mark Austell v. Aaron Henderson. Please proceed. Good afternoon, Your Honors. Good afternoon. May it please the Court, Counsel? I am Kelly Taylor from the Office of the State Appellate Defender. On behalf of the defendant, Aaron Henderson. Mr. Henderson was convicted of first degree murder under an accountability theory following a jury trial. There are four issues in this case, but today I will be talking about the first two. There were two instances where the Court committed reversible error. One, where it conducted improper ex parte communications with the jury during deliberations. And two, when it allowed the jury to improperly review audio and video evidence during deliberations in the presence of third parties. The third issue in the case is a crankle issue to which the State has confessed error. And the fourth issue is an excessive sentence issue. I am prepared to take questions on any of the four issues. Mr. Henderson respectfully requests that this Court reverse his conviction for first degree murder and remand the case to the trial court for a new hearing. If this Court finds that a new trial is not warranted, we ask that you accept the State's confession of error and remand for a new preliminary crankle hearing. In the alternative, Mr. Henderson requests that this Court reduce his sentence. Following closing arguments, deliberations began at 1231 p.m. At 210 p.m., everyone, all the parties were present. The jury had a question about an instruction. And then at some point after that, the jury requested to review the 911 call and the video from the 11th Street Mini Mart in this case. The jury was brought into the courtroom and the parties were not notified. The Court instead told the jury that Ms. Bernard, a representative from the State's Attorney's Office, would assist them in reviewing the evidence. And the Court told them not to discuss the case in front of Ms. Bernard. The judge said, so you can watch whatever you guys want to watch and if you want to watch it two or three times, I'll keep her here as long as you guys want it. Later, the jury again requested to review evidence. This time they wanted to view the defendant's police interview. The parties were again not notified and the jury was permitted to review the evidence with the assistance of Ms. Bernard, but that second time there was no instruction. The judge's conduct here led to two major errors. The first one being that it had the improper ex parte communications with the jury and the Court deprived Defense Counsel the opportunity to object to the evidence being reviewed or the manner in which it was reviewed. And second, the presence of the third parties during deliberations created a chilling effect on the jury. Now, communications between the judge and the jury after the jury has retired to deliberate, except when held in open court and in the presence of Defendant and Defense Counsel, deprived the defendant of his fundamental rights. It deprived Mr. Henderson of his right to appear and participate and of his right to have counsel represent him at every stage during trial. You agree with looking at this under a plain error? Yes, Your Honor. You can review it under the first prong, plain error, because it was, as we argued, closely balanced, or under the second prong, structural error. And I also make an argument that Defense Counsel was ineffective for failing to move for a mistrial when he was informed of the error. But for ineffectiveness under the first prong, you've got to go to show that, likely, these things changed the result. If we're looking under the first prong, plain error, it might have affected the outcome of the trial or the jury's verdict. Yes, Your Honor. Okay. But under second prong, if it's structural error, it's just we don't look at outcome determinatives. It's just you can't do that. There are some arguments to be made that this is structural because it was so serious, especially letting the jury view the evidence in front of the third party. Well, it wasn't even a representative of the state, was it? It was a representative of the state. Now, the state on appeal argued that Ms. Bernard is an office administrator and not an assistant state's attorney. However, I believe the state had to research that on the Internet because it was not made apparent to the jury who Ms. Bernard was and that she was not an assistant state's attorney. So I would argue that she's not an assistant state's attorney. It does not really matter. The first prong is a close imbalance. Yes. Would you argue this is a close imbalance? Yes, I would. How is that? Well, because there were a number of inconsistencies in this case. There was the witness who was present at the crime scene testified she heard one gunshot when really there were four. This was middle of the day. They weren't wearing masks. They were at their friend's house. What kind of robbery occurs in the middle of the day at your friend's house? And there was also no way that the defendant here could have known that the shooter, Yolanda McDuffie, was going to go rogue and for no reason pull out a gun and shoot Mr. Jackson. It's arguable that it could have gone the other way in this case. Certainly it went in his favor because he was found to not be the shooter. It was an accountability theory, but he also... They knew each other. They did. He was very close. The defendant was very close friends with the victim. There was one... His cousin testified. He was 16. He was at the scene. He testified they were just going over to the victim's house. I think they were going to buy some cannabis, but there was no talk of a robbery. And then for this third person to just go rogue, essentially, and shoot and kill the defendant's good, close friend, this could have gone another way. He could have been found not guilty. Didn't the woman that knew him also see him leaning over the body of the victim, going through his pocket? She did say that he was leaning over the deceased, but she, on cross-examination, she said that, I mean, it happened so quickly, she could not be sure that he was going through the pockets. But she saw your client standing over the freshly shot body of the decedent, right? She did. I mean, theoretically, he could have been checking to see if the decedent were deceased, feeling for a pulse or feeling... I think he quickly realized that Mr. Jackson wasn't recovering and that they were now at a crime scene and there was then their third rogue shooter friend to worry about, too. How does this fit in under the Thompson 30th structural error? More so, there's, in some of the other cases, in McKinley, in the descent, in Johnson, in the descent, in Olano, in the descent. That's what's troubling me. In Thompson, the majority, in Thompson, it's hard to find, because you're talking about descents now, but you can see language in some descents, but where do you see it in the majority about how broad structural error is? It doesn't seem to be very broad. It seems to be very narrow. Well, here, the error is really compounded, because not only is the sacred jury deliberations, which is talked about in Olano, not only is that interrupted by having a third party present, but defendants' right to be represented by counsel was also affected here and his right to participate, because no one told defense counsel ahead of time what they were doing or how they were going to review the evidence here. What do you mean by participation? Because they were reviewing tapes. They were reviewing evidence, yes. So what would be the participation, besides sitting in a chair watching the jury watch a tape? The participation would be the opportunity to object and say, hey, we do not want the jury to have free reign to watch this evidence over and over again. For example, the 9-1-1 call, the state had just played it during their closing argument. So now, just a couple hours later, the jury wants to review it again, and defense counsel in his closing argument called it horrific. Presumably, had he had the opportunity to object beforehand to this being played, he would have, rather than let the jury hear this horrific 9-1-1 call over and over again, elevating this evidence above other evidence in the case. Let me ask you, in any of these cases we're talking about here, are there any cases where the jury was viewing evidence in the presence of a representative of the state's attorney's office with nobody for the defense there or even notified? No, Your Honor. In all the cases that I've seen on this subject, there's usually the judge, the state, defense counsel, all present. Now, we would argue that no one should be present during deliberations, that if a piece of evidence needs to be reviewed and only one person in all of the court can play the video, that person should push play and then leave. But in these other cases, like McKinley and Johnson, where they let the jury review the evidence in the presence of other people, they all had defense counsel there to presumably be able to notice if body language was impacting the jury, if any other defense counsel should be present, if the state is present, definitely, to be able to object and observe and make sure his client's rights are protected. So counsel was informed of what evidence the jury wished to review after the fact. At this point, it was too late, the cat was out of the bag, and yes, he could have moved for a mistrial, and he should have moved for a mistrial. He was ineffective for not moving for a mistrial. But for sure the better practice here would be to have called the parties in before letting them review evidence and allowing defense counsel the opportunity to object contemporaneously instead of cutting him out entirely and depriving him of his opportunity to make a meaningful contemporaneous objection. Additionally, he should have been able, as we discussed, he should have been able to object to the presence of a representative from the state's attorney's office. The state on appeal argues that a professional would not let their body language alter the jury's opinions, but we argue that it's unconscious, even if the bailiff and even if Ms. Bernard were very professional people, their facial expressions, body language, could still give a negative inference of the evidence to the jury, which is why no one is supposed to be allowed in the courtroom, let alone a representative from one party. Additionally, we would argue that the court erred when it conducted ex parte communications with the jury and hastened the deliberations. When the jury requested evidence a second time, the judge told them that he was going to call them in in 10 or 15 minutes anyways because by 5 or 5.15 p.m. he wanted an answer about whether they would order dinner and keep deliberating or whether they would come back in the morning. The verdict was then reached at 5.15 p.m. So we don't have an exact timeline, but it can be inferred that it only took 30 to 45 minutes at the most, maybe even as little as 15 minutes for the jury to then reach their verdict after the judge kind of informed them that he would be speaking with them. And under Ross, that's a sign that they were influenced by the judge's hastening of deliberations because they were quick to come back with a verdict. The judge, again, should have consulted with the parties before having any communications with the jury at this point. Mr. Henderson respectfully requests that this court reverse his conviction and remand for a new trial. If this court finds that no new trial is warranted, we ask that the court remand for a preliminary crankle hearing. And in the alternative, Mr. Henderson asks that this court reduce the sentence. Are there any other questions? Thank you, Counsel. Thank you, Your Honors. Counsel, you may proceed. May it please the Court? Counsel. The defendant argues that he was denied his right to be present and denied his right to counsel on trial judge-ex parte communications with the jury during deliberations. In his main brief, the defendant acknowledged that he did not preserve this issue for appeal and has also acknowledged that here in the argument. The defense counsel failed to object when and after the fact he learned of the ex parte communication. And the record shows that an objection would not have fallen on deaf ears if the judge would have heard that objection. The defendant also did not enclose this in a post-trial motion. Therefore, the defendant has forfeited review of his claim. He has the burden to demonstrate prejudice and he has failed to do so. Thus, there is no justification for excusing the forfeiture. The trial judge had two different ex parte communications with the jury during deliberations to arrange for viewing of different videos. The Gale Court said that when a jury asks to review evidence, it is error for a judge not to make a preliminary determination as to what evidence the jury wants. And it is also error to fail to exercise discretion in responding to the jury's request. Thus, the trial judge did not prejudice the defendant by arranging for the jury to review the videos they requested. In his main brief, the defendant asserted that even if he had been present during the ex parte communications, this still would have been error because the defendant had a right to representation at all critical stages in the proceedings. The defendant conflates the denial of his right to be present at proceedings with the denial of counsel. The defendant is always represented by counsel during proceedings and he has not claimed that he was not. The defendant asks this court to reject defendant's, rather the people ask this court to reject defendant's attempt to conflate ex parte communications with complete denial of counsel. Under both the federal and Illinois constitutions of criminal law, the defendant has the right to appear and participate in person and by counsel at all proceedings which involve his substantive rights. Here, after the fact, all parties were informed of the ex parte communications and defense counsel questioned the trial judge but decided not to object to the procedure at that time. Thus, the defendant was denied the right to be present but not the right to counsel. Our Supreme Court has repeatedly held that it is not per se prejudicial for the trial judge to communicate ex parte with the jury. A new trial is only required where the defendant was prejudiced and prejudice only occurs if an ex parte communication affects the jury's deliberation. The defendant has not shown that the communication affected the deliberations in this case. Well, let me, if we could fast forward just a second. Let's talk about, have you ever seen a case where juries are allowed to review evidence in the presence of a representative of the state's attorney's office without even prior notice to defense counsel? I have not seen a particular case, but as we said in our brief, and counsel correctly observes that we did go online  Well, but the judge told the jury that this, she's worked at the state's attorney's office. Correct, but they also know. And the point of this is, is that just the way we do things where we let juries sit and review evidence without even notifying the defense, giving them the opportunity to be there and then sticking a representative, an employee of the state's attorney's office in the room. See, they're on the other side of that fence. I understand your concern, Your Honor, but we also have, the jury had the experience with this particular individual during trial running the system and she was, only as far as the jury knew, was to be there simply to run the system and had no part, obviously had no part in the prosecution because there were two prosecutors. This individual, Ms. Bernard, did not prosecute this case at all. She was apparently not at the prosecution table at any time, according to the record. She was prosecuting the case by running the table. Well, in that sense, yes, Your Honor, but simply ruining the machinery, and that's what the jury was informed. That's why she was there to run the case. I'm just thinking this. Correct. Does this speak well of the criminal justice system when we're this loosey-goosey on a murder trial where we allow this to happen? I'm worried about the second phone and whether this is structural error, the point where even if there's no prejudice, is we just don't do things like that. Well, I agree there would have been a better procedure to have contacted counsel ahead of time. I don't disagree with that. It wasn't the best procedure to follow, potentially, in this case. We did have the bailiff, of course, in the room that was supervising, and the jury, of course, had knowledge of the bailiff's role from having... Well, let me ask you this. If we affirm, will we be the first court that's ever said it's okay to let the jury review evidence with an employee of the state's attorney sit in the room with them without any prior notice to the defense counsel? I am unaware of any other case where that scenario has come up, so I can't speak to everything because there may be unpublished cases where that happened, but I am unaware of a published case. So you're asking us to break new ground? Potentially. I mean, there are plenty of cases where they're different. It's that damned if you do, damned if you don't kind of situation where nobody's in a room, everybody's in a room, it's in a courtroom, it's in the jury room, and cases go back and forth in all these situations. This may be unique in this one aspect, but I think we need to keep the focus on was the defendant prejudiced by this? We don't look at prejudice under the second prong, would you agree? That's only under the first prong. Under second prong structural error, we just say, this is just so wrong, it can't happen, and therefore that's what second prong error is. It impugns the integrity of the judicial system and makes people wonder what the hell's going on while the jury's deliberating. There's an employee of the state's attorney's office in the room with him and the defense counsel didn't even know about it. And you want us to say that's okay? What I'd like to do is, did this affect the fairness of the trial? And there's no record here. Or the appearance of fairness. It may not. Certainly, you've got to admit, it just got a bad ring to it, don't you think? I can't disagree with that, Your Honor. It doesn't look good to have that scenario. But again, if we're looking at the experience that the jury had with this person, they knew her role was simply to run the system. They knew that in this particular case there was no video system in the jury room, we presume, because it's not in the record. That's why they brought him into the courtroom to review this video. The jury was specifically told, this is the only person here who knows how to run the system. So this is what they had. They had the fact that she was there to run the system. She's the only one who knows how to run the system. We're going to leave a bailiff here so you don't communicate during the course of this. It's a very unique situation. I don't disagree with that. But I don't believe it rises to the level of structural error. I don't believe it affected fairness, especially since counsel had been sitting through this, had been working with Ms. Bernard to redact videos and such, had known of the process during trial, and with some questioning of the trial, the judge said, okay, there's no problem here, let's move on. So... The second problem is an error that was so serious that it affected the fairness of the trial and challenged the integrity of the judicial process. That's correct, Your Honor. And that's what Justice Smith's asking about, right? I mean, that part of Heron has never been overlooked. Correct. Thompson, I think, further explained that, right? What structural error is. There have been numerous courts that have worked on structural error, and it's been slightly modified over the years as to how far the boundaries go. This particular scenario, as I mentioned earlier, I don't know. I have not seen it in case law that I've reviewed. I don't see that having an individual... Unfortunately, she was a member of the staff, and certainly in Rock Island, they should have had more than one person running the video system, but apparently they didn't at this time. Part of the problem is that, because the defendant wasn't even aware that the request had been made, or that maybe defense counsel's assistant would have been able to run the video. He's the only person in the building. We only can assume that, you know, there is nobody on the defense side that could run it. We don't know that because they weren't even there. They weren't there to object. They weren't there to acquiesce. They were not involved in the process at all, which is different than some of the other cases. Again, and also as to the other issue in this area about the judge's comments during deliberations, about their deliberations. I mean, Ross kind of says that, you know, if the judge is talking about deliberation deadlines or whatever outside of defendant or defense counsel, it's presumptively coercive. And then the state has the burden of demonstrating why there's no prejudice. Well, here, I mean, we don't have the defense counsel or the defendant even aware that this is going on at all. So, I mean, I just don't see how there is any question about whether or not, you know, there's a fairness issue. I mean, you know, I know that whether it's first prong or second prong, I don't know how you use it. There's no... But there was no opportunity to even be heard at all or say, no, we have somebody that runs that tape, Judge. They didn't even know about it. But, Your Honor, during trial, defense counsel could have said, we have somebody that runs this. At the time after he learned of this ex parte communication and that Ms. Bernard had been in there running this, counsel certainly could have brought that up and said, we could have brought somebody in to do this. We had somebody. But they didn't. He couldn't do that. Well, they never knew it was going to be shown. He never had noticed that the jury was going to look at this. Correct. And secondly, if he had noticed it, even if this woman was the only one that could have run it, defense counsel and maybe the defendant could have sat in the room and said over there, too, to observe what was going on, as they certainly had the right to do. And so it's just... That question really isn't even relevant for a second prong issue because the second prong issue in dealing with structural error, it's not a matter of how strong the evidence is, how strong the evidence is about the person's guilt. It's does this structural error go to the heart of a criminal justice system? Is this a question that goes to something that's so unacceptable to our sense of fairness of the trial that once this happens, you're going to reverse the case because it's just not fair in our system of justice. And so once something like this happens, it's unacceptable. So once something like this happens, and you're talking about running and rerunning a piece of evidence that the jurors think is important, and you're running it, rerunning it, and you've got a member of the staff of the state's attorney's office there, and the jurors go, run that again, run that again, run that again. And they thought this was an important piece of evidence to see, and to see over and over, to focus on over and over, with nobody from the defense people there. But, Your Honor, we have no evidence that they ran it over and over. It could have been a one-time play. We have no knowledge of how many times they played it. And exactly, and the reason we don't have any of that was because the defense didn't have the opportunity to be in the room. So you can't say, gee, you've got no proof that anything untoward happened in that room, and the reason you have no proof is because the trial court didn't give the defense attorney a call and say, hey, jury's got a question, you want to see some evidence, get yourself over here, and we'll talk about it the way it normally happens in a criminal trial. And so to say, yeah, that's right, if you put the member of the state's attorney's office and the jury in a room together, you come out here every day and argue, well, there's no evidence that anything wrong would happen in that room. What we're talking about, as Justice Carter pointed out, what I was trying to drive at earlier, is something that just makes the, let's face it, the closely balanced argument in this case isn't a very strong one, but at the same time, you've got something happening here that when you phrase it the way I did, okay, the jury and a member of the state's attorney's office are in the room together while they're reviewing evidence without any notice to the defense counsel, people say, well, that's not the way we do things in America, not even in Illinois. You're right, Your Honor. This is a highly unusual situation. There is no record. I can't deny any of your comments and your concerns. That's a fact. I'm going to try. You've got to deal with the record you have. That's true, Your Honor. I won't go farther with the first or the second issues. I will speak briefly about the fourth issue about sentencing. Defendant claimed that his 40-year sentence was an abuse of discretion. Defendant was 20 years old at the time of the crime. He was an accomplice to first-degree murder and his sentence range is 20 to 60. So he's dead center in the middle of that range, and therefore his sentence is presumed not to be excessive. In our brief, people relied on the key. In that case, the defendant was 18 years old. She did not commit the double murders, though she was a participant in the whole scenario, and she received a mandatory life sentence for that. This court was aware of research showing that an 18-year-old brain is not fully mature, and the court appreciated that the trial judge had frustration at having to impose a mandatory life sentence because Ms. McKee had a horrible life situation. She had been kidnapped. She had been prostituted repeatedly. Just a terrible life situation, but the court still affirmed a mandatory life sentence. This court noted that McKee offered no evidence in the circuit court on the science of juvenile development or how it applied to McKee, and this court rejected her request to follow that line of studies, et cetera, that were presented on appeal only, and the people asked this court to do the same thing regarding the studies that the defendant had cited in his main brief that were not presented to the trial judge, and the people asked that this court affirm the defendant's conviction in the sentence. Thank you, counsel. Thank you. Counsel. Thank you. So in McKinley, this court, even though it didn't find prejudice, it said we would caution circuit courts that the procedure utilized by the court in the instant case could have the potential of becoming problematic and possibly lead to prejudicial error in some cases. This is obviously problematic in this case. As Justice Schmitt said, was bothered by, and as we're very bothered by, that the state is there, no one from the defense is there, and defense counsel was not given a heads up. This does make a good case for second prong structural error, especially McKinley, again, it calls one of the fundamental tenets our judicial system is grounded upon is the mandate that the deliberations of the jury shall remain private and secret. This is a fundamental tenet, a great candidate for structural error, and I discussed earlier how there's a lot of dissents who would argue, dissenting opinions that argue that this should be structural error, presumed prejudice. Olano also has a dissent, which I'm not going to cite to you because we know it's the majority opinion that counts, but in Olano the error was not nearly as severe. In Olano it was alternate jurors sitting in. They didn't have a representative of the state's attorney's office sitting in and defense counsel being totally unaware, so we would argue that this scenario is much more serious than in Olano and, like I already said, is a great candidate for second prong structural error. Any further questions? Thank you. We'll take this matter under advisement and render a decision, and now we'll take a break for panel change.